20-8064 and 20-8066. Council are present and we'll hear from Penalty Counsel, Mr. Kurtz. Mr. Kurtz, I'm sorry, you're muted. Thank you. Yeah, we'll go much better this way. Thank you. Can you hear me okay now? You bet. All right. Thank you. May it please the court. My name is John Kurtz and I represent the plaintiff, appellant, and cross appellee Safeway Stores 46, Inc. In this case, which I'll refer to as Safeway. Safeways claims in this lawsuit fall into 3 different categories that require the application of different legal theories. However, before discussing those 3 categories, it should be noted that the District Court made 2 rulings in favor of Safeway that have not been challenged by WY Plaza and that apply to each of the 3 categories of claims. First, the District Court denied WY Plaza's motion for summary judgment based on Wyoming's 10-year statute of limitations. Relying upon the Moncrief case, the District Court found that the lease is an installment contract pursuant to which the cause of action accrues and the statute of limitations runs from the date of breach for each rent payment. The District Court held that the statute of limitations with respect to all of Safeway's claims, which are each after the 2012 calendar year, had not run. As a result, Safeway's claims in this case for each year first accrued at the end of the year that each percentage rent payment came due and Safeway had the contractual right to set off the addition costs against the percentage rent amount. Second, the District Court fully agreed with Safeway's interpretation of the lease and the 5th modification and there is no dispute about the amount of the addition costs and the amount of interest that has accrued based on the terms of the lease and the 5th modification. In addition, WY Plaza has never argued otherwise on appeal. The first category of Safeway's claims is for the recovery of $670,872 in percentage rent payments that were mistakenly made by Safeway to WY Plaza for the calendar years ending 2012 to 2017. The exact amount of those percentage payments made for each of those years is not in dispute and are set forth at page 12 of Safeway's opening brief. Safeway relies upon the doctrine of payment by mistake, as described in the Restatement 3rd of Restitution and Unjust Enrichment, Section 6, which provides quote, payment by mistake gives the payor a claim in restitution against recipient to the extent payment is not due. Illustration 9 of the Restatement underscores how Restatement 6 requires the recovery of the payments mistakenly made by Safeway from 2012 to 2017. That example states, Landlord erroneously bills tenant for rent at $1,000 per month, which tenant pays. In fact, the lease calls for a monthly rent of $500. Tenant has a claim for restitution to recover the overpayment. The result is the same if landlord submits no bills for rent and tenant pays too much as a result of his own misreading of the issue. Restatement 1st, Section 18 of the Restatement also supports Safeway's claim. It states, a person who has entered into a contract binding upon him and has paid money to the other party thereto under an erroneous belief induced by a mistake of fact that the terms of the contract required such payment is entitled to restitution from the other, except where the mistake is only as to the time of the payment. The reasons for the mistake were fully explained in the declarations of Lynn Miller and Thomas Hanavan filed in support of Safeway's motion for summary judgment. Those explanations were never contested by Y-PLAZA. The District Court denied Safeway's motion for summary judgment and granted Y-PLAZA's motion for summary judgment to dismiss Safeway's claim for recovery that payments made by mistake from 2012 to 2017 on two grounds. First, the District Court erroneously concluded that Safeway's claim was barred by the Doctrine of Latches. District Court reached that conclusion, even though Y-PLAZA never moved for summary judgment in its favor based on the Doctrine of Latches, and that Y-PLAZA did not file a single declaration, affidavit, or cite to any deposition testimony or otherwise present any evidence in support of its affirmative defense based on the Doctrine of Latches. Let me ask you a couple of questions. Sure. In the District Court, did you originally start out seeking to go back, I guess, 18 years and not just to 2012? When we originally filed the complaint, I believe that we included one year of about $89,000 in percentage rent payments that we thought we should not have paid. However, in response to the pleadings that were filed by Y-PLAZA, they raised an estoppel certificate that we had entered into and a settlement agreement that we had entered into. When we reviewed that and thought about the payment by mistake doctrine, we concluded that we had settled that claim, and therefore, we withdrew that claim for around $89,000 in percentage rent. Our earliest claim for percentage rent was for the year that ended in 2012, and of course, the percentage rent amounts become due at the end of each year, and that's when you would set off the addition cost and the interest that's accrued. Okay. Fair enough. I just want to make sure that the 2012 date didn't appear for the first time on appeal. No, that's what we argued below, and we conceded that issue very early in the case in our summary judgment filings that we made. We felt that, particularly under the payment by mistake doctrine, that we had entered into a focus on it at the time that we entered into that settlement agreement. All right. And you don't dispute, do you, that just because your 2012 forward claims are within the limitations period, that that would preclude the doctrine of latches from applying? No. My understanding is that a doctrine of latches can be applied for less than the time period of the statute of limitations. I understand that. But there's just, you've seen our arguments as to why we don't believe that the court profitably applied the doctrine of latches. I got you. I'm just drilling down on a few things to make sure we're all, we're agreeing on some principles and see where we might separate. Okay. How about the idea that at least under some set of facts, I understand that you're not going to agree that this is that set of facts. That the doctrine of latches could preclude you from ever enforcing this article 20 of your contract. I don't see how, I don't see how you can do, use the doctrine of latches against the payments that were made under protest or the payments that we're seeking a declaratory relief on. And the reason for that is, and maybe it's unique to this case, is that there's no dispute that of the amount that the addition cost was. In fact, Y Plaza was a signatory to that Fifth Amendment. So they clearly, even though they were not the original less owner of the property, they were a signatory to the Fifth Amendment. And in that Fifth Amendment, it clearly sets forth the addition cost. And then the interest that's accrued on that is just simple math. And we had a person who was an expert on math, I guess, to come in and tell us. He was actually a financial expert who told us number one, what the bond rate was, and then also told us what the calculation was for those amounts. So I don't see how the doctrine of latches could apply at all to those two time periods, because it's not relevant what happened. The only thing that's relevant for those two claims, meaning the payment under protest as well as the payment, the declaratory relief, is number one, was the addition cost incurred? Yes, it was. Clearly, there's the knee agreements. And secondly, was interest accrued? And are those two amounts greater than the percentage rent amount that we're trying to apply it against each year? And as you can see from our briefing, the amount of the addition cost and the interest that's accrued on that is close to $6 or $7 million now, because it's never been applied. In the early stages, there was no percentage rent that came due. So it just wasn't until much later that occurred. So hopefully, I answered your question. But I don't see how the doctrine of latches ever was applicable. And quite frankly, the district court never explained that. And I've never seen an argument from Y Plaza as to why it would apply. It's almost as if the district court just looked over the top of that. And it was very surprising for us. Well, I'm going to ask you one more, and then I'm going to quit hogging your time. Oh, no, I appreciate it. Thanks for the questions. And I guess my last question is, we'll go with you that you had an internal mistake that caused you not to catch this for a long time. And it occurs to me that at some level, you didn't catch this for many years. And now you want to enforce it. And in the meantime, while all this was going on, while you have the clock ticking at a 7.5% interest rate, a lot of the years in this time period had historically low interest rates where the cost of money would have been substantially lower than the 7.5% you want to calculate your interest on that you want to recover from Wyoming Plaza. And I guess my question to you is, doesn't it seem inequitable that you would want to be paid for your mistake at this 7.5% rate when if you'd have enforced it in a timely manner, there would have been other ways possibly for Wyoming Plaza to buy out your interest or something with lower cost money? Well, I understand that argument. And that was obviously something that the district judge picked up on as another reason for the application of latches. But as we pointed out in our brief, given the calculations that are made, I don't think it ever becomes an issue. And the reason for that is because certainly the 7.26% interest rate was specified in the contract. So that's the rate at which it was going to run. Even if you were to knock off $3 million worth of interest, I mean, as I think we said in our brief, it's going to be 45 years if you don't accrue interest from this date going forward based on the way the percentage rent has been coming up at about $125,000 a year before you'll ever pay off the addition cost plus the interest that accrued as of today. So it's really a moot point. But as we also pointed out in our brief, because this is a claim for restitution, if you do the math and you somehow conclude, which I don't think you would if you do the math correctly, if you do the math and you conclude that somehow Y Plaza was hurt in some way because the fact that we waited a while before we identified this mistake that we made, which was, by the way, only four years. We made the claim in 2019 and it was 2012. So I guess that's seven years or less than seven years. But if you do the math, it's never going to come into play. But even then, as a court of equity, which you'd be acting to as a claim for restitution, you can just make an adjustment. I don't think you'll ever make it because we've run the math and we can see what it is and it just never comes into play because the interest ran at a high rate at the early stages and there just never was any percentage rent that came due until the year 2012. But that's the way I think it would be dealt with if the court really did a calculation and said there's some adverse consequence as a result of the delay and the mistake. Hopefully that answers your question. Thank you. I don't know if I'm close to being out of time or not at this point. You have 10 seconds. I was hoping to reserve a little bit of time. I have a question. Thank you. Yes, your honor. My understanding that you take the position that laches cannot apply when each year there's a new opportunity for your client to choose to not pay percentage rent or to pay it. And that's one of your reasons why that laches can't apply. I believe that's true in this case, your honor. Yes. Okay. So that's your reliance upon the contract and yet you want to go outside the contract to find an ability to recover for the earlier years. I think it just seems inconsistent. I guess I don't understand that question that well. I don't know how it is that we are going outside. We certainly are not going outside of the contract for recovering any claims for the reduction of percentage rent for 2018 on. So I don't see that, but I don't know that I see how we're going outside of the contract. But if you're claiming mistake, there's nothing under the contract that gives you the opportunity to recover that. So you do have to go outside the contract to recover for those earlier years where you did not pay in a protest. Well, I guess the question, your honor, is I think if you look at the restatement, what the restatement is really saying is that if you conclude that a payment was made by a mistake, the court has the ability to fix that and to award the money back to the party who made the payment mistake. And what the restatement and the comments in the restatement indicate is that's basically because the restatement is implying and the law implies that when you do make a payment by mistake, you are entitled to receive it back pursuant to the terms of the contract. So it's really almost an implied term in the contract that if you overpay mistakenly, that you can recover that back. And I think if you read the comments to the restatement. Are you saying then your theory is implied contract? I'm sorry, what? Are you saying that your theory for recovery is an implied contract? Well, I'm saying that I'm reviewing the language in the restatement and the restatement payment by mistake indicates that it's understood that if you do make a payment, let me if I could. I understand. I just thought you were saying it's implied in the contract. Well, it's understood that when a payment as you don't have to have a representation in the contract, which says that if you make a payment by mistake, you get to recover it back. I mean, that's not a prerequisite to. So in a way, I guess it is. Implicit in a contract that when you overpay, you have the right to recover it back. But I don't I'm not because the reason why I hesitate on your answering your question is I don't as you know, under the under the law, there is a quasi contract type concept. This our theory is not a quasi contract type theory, sometimes referred to as an implied in law theory. And we're not relying upon either of those two legal concepts in order to recover the monies that were paid by mistake. Judge Beck, your question. Judge Beck, correct. Would you indulge me for one moment? Sure. So would you would you agree that the ability to set up? This I can't remember the exact term of art, but like a repayment account or an amortization account, right? Um, is based on permissive language in the contract? Well, I mean, you have to do it. There's a provision in the agreement that it says there's going to they're going to create an amortization account. Well, it says you can, right? Yes. And and we didn't do it right away. All right. But it's just a perfunctory sort of administrative proceeding where you write down the numbers. No, I understand. Let me let me before we joust too much about what it really is. OK, I just I just want to be clear. I mean, it's permissive. You didn't you didn't you didn't have to. And you didn't have to. I mean, this was something that put the burden on your client to set up this account. And to let the lessor know there were going to be these deducts. That's my understanding. Yes. OK. So I what I just wonder if that cuts against your argument that there's this implied right to go back and get monies, you know, purportedly paid by mistake when it was based on an obligation that was permissive anyway? Well, I don't know that I agree with that. I don't think that's the case. I don't know why that failure to prepare that one page document that would say how you're amortizing it would preclude that because it really was is a simple thing to do. Number one, you look at what the addition cost was, which is agreed to. And you know what the interest rate is and everybody can calculate the interest. So the fact that an amortization account was not somebody who didn't actually put those two numbers down in writing somewhere until a later date doesn't seem as though it would have any impact on the enforceability of the contract or the terms of the agreement. Well, I agree, but I guess my point is it's not self-executing. I mean, there has to be a purpose in having it. It can't just be perfunctory and mean nothing if you included it under the canons we have to try to give effect to all the words you use. And if it I mean, I can think of a number of reasons why you would have that requirement in the contract that you prepare this amortization schedule and show it to the other side, because presumably they might want to object to it. They might disagree with some of your numbers. It keeps everybody on the same page. And I guess my concern is that, I mean, you didn't do it. It wasn't something you had to do. It was permissive. But your argument is, well, we didn't have to do it. And we didn't, in fact, do it. And then many years later, we're back claiming that there's some kind of an implied requirement in the contract that they pay us back. Well, again, we're relying upon the payment by mistake doctrine, which is not straightforward. I understand that. But you describe that as not being outside the contract because it basically implied a term in the contract. Yeah, I think that's consistent with, you know, basic contract law. Although it is, you know, a restitution type claim, but payment by mistake is, you know, it's clearly recognized that you can rely upon that when there's a contract. I mean, the example that I quoted from earlier today and cited in our brief, you know, is directly on point. There was a landlord who is paid more than from the tenant than what he's supposed to, and it implied that. But and I apologize if I'm not adequately responding to your question. I just don't see how the failure to have the amortization account put on paper earlier than it was would impact this. Certainly, that was not a basis for the district court's decision, and quite frankly, I don't believe that there was ever an argument made below by La Plaza that would impact it. Can I ask this just to follow up on Judge Carson's question? On page seven of your opening brief, not about the amortization document, but it says Article 20D of the lease allows Safeway to deduct from its annual percentage rate any cost paid by Safeway plus interest at the bond rate, et cetera. And I want to ask you, what do we do with the word allows? And to flesh out your colloquy with Judge Carson a little bit, let's say I'm a franchisee and I pay the franchisor, let's say an ice cream company, a franchise fee, and I am allowed to deduct my advertising costs or 20% of my advertising costs per month from my monthly franchise fee. And I pay a lot of money on advertising and I don't deduct that for, let's say, a couple of mistake days. Because it's not a matter that your rent was $100 and you paid $500. You were allowed to make a deduction that you didn't do. And so there can't, by definition, there can't be a mutual mistake. Because how would Wyoming Plaza, from their standpoint, they would just assume, well, they knew the construction had been added, but under the 20D, they would be certainly within their rights to say, well, Safeway didn't exercise its discretion to make that deduction. In my situation, would I, as the franchisee, be able to recoup my advertising costs because I neglected to take advantage of the deduction? I don't know what your contract reads in that particular case. But getting back to our case, I mean, I appreciate that the contract does not require us to insist upon allowing a deduction from percentage rent. So if we had, for example, called Y Plaza and said, hey, look, you guys have been great tenants, great landlord this year, we are not going to reduce our claim for percentage rent. We're going to go ahead and pay the full amount, even though we have the right to reduce it by the addition cost. If we'd done that, we would have waived the claim going forward. But that's not what occurred here. What occurred here is that we made a mistake. We internally did not realize we had not paid it. Y Plaza was in the same position as we were to know that we made a mistake, or at least that we had not paid it. If they brought it to our attention and said, by the way, you know, you guys are owed this ability to deduct the percentage from the percentage rent and reduce the percentage rent by the addition cost and the interest, and we declined to do it, I think we would have waived it again. But I don't think that there was a waiver that occurred in this case, because it clearly was a mistake by which we didn't make the payment. And I think, really, in most cases, you would never get payment by mistake if you applied too strict of a standard of, well, if you didn't make the payment, you're just out of luck. And I hope that answered your question. You did. You did. Thank you. Judge Murphy, do you have any more questions? No, I don't. Judge Carson, do you? I don't have any more. Thank you. Well, thank you very much for all the very good questions. And I didn't, I guess I have no time reserved. Well, I'm going to give you one minute. Okay, thank you. And we'll hear from the appellate. Judge Bacharach, Judge Murphy, and Judge Carson, may I please the court, the counsel. Sean Larson of Hathaway & Coons, and I'm appearing for the appellee and cross-appellant Y Plaza, LC. This is a case about honoring the terms of your contract, taking responsibility for your company's own inactions, living with the consequences of that mistake, and not compounding the situation by filing a lawsuit, blaming somebody else for your mistake. Well, counsel, they're not blaming anybody else for the mistake. They're owning up to the mistake. And for laches to apply, which you said involved a factual question and therefore should not be resolved on summary judgment. But going forward with that, for that to apply, you have to show that you have been detrimentally impacted. How would you be detrimentally impacted if it was allowed that they can not pay percentage rent? Judge Murphy, I respect the question and your point about blaming. I could clarify and say that, in essence, you're blaming because you're asking for somebody else to pay for your mistake. Let's go on to the meat of the question. To the meat of the question, we believe that Safeway put on evidence to demonstrate the prejudice that's demonstrated under the doctrine of laches. And that is through their expert who provided testimony on $3.5 million in interest on the due to the time delay. And so, essentially... Was the interest compounded? Yes, the interest was compounded. And so... Under the contract, it calls for compounded interest? The way that the amount works out specifically, I believe it includes a compounding of the interest. And the total balance owed was supposed to be somewhere in the range of $2.5 to $3 million without interest. And then, in addition, there's $3.5 million in interest that was added to the number due to the delay since dating back to 2005, the first year that percentage rent would have been due. But all that can be fixed. It's just a mathematical calculation. You can just go back and say, well, the numbers would have been substantially different on the amount owed in the amortization account had we timely requested or timely not paid the percentage rent and just paid the minimum. Well, and that's one portion of the prejudice, which goes to the financial... Wait, wait, wait, wait. My point is you have to answer that. Why is there prejudice if that can be easily calculated by the district court? Well, there is prejudice because of the delay in time from making this particular claim. So had Y Plaza been put on notice and been provided with the deduction, which is a permissive deduction, a May deduct, had it been deducted in 2005, 2006, 2007, and so forth, then at that point in time, Y Plaza would have been able to pay off the balance that was out there and assess what the interest rate looks like going forward. Y Plaza would have been able to keep up with the balance to keep that interest rate low, but instead the number... I'm not following you. I'm sorry. I'm not either. I don't know. Could you explain that? When you say Wyoming, and I hate to interrupt you, but I just wasn't following. So when you say Wyoming Plaza could have done what? They could have paid off? Paid off what? So let's go back and assume that a timely deduction and amortization account, the amortization account was created, a timely deduction was made, and notice was sent from Safeway to Y Plaza to say that specifically, here are the construction's costs, here is the amount that we're going to be deducting from, and so we're not paying you percentage rent in this particular year. And so each year moving forward, it would pay the percentage rent or not and elect to deduct. And so in each one of those years, that balance could either move up or down. And at some point, Y Plaza could just elect to pay off that amount to essentially get rid of the deduction moving forward. You're assuming that the principal is going to be going down, right? And I assume that if they take the deduction, it's going to be applied to the interest that they otherwise owe Wyoming Plaza. Yes. All right. So the principal is going to presumably remain static. So Wyoming Plaza, I'm still, I just don't understand. So Wyoming Plaza, I don't understand when you say they pay off, they own it. They own it and the credit for the deductions goes to Safeway. So then what Safeway can do is pay less in percentage rent moving forward. But now we have a complaint which makes a demand for a certain amount and demand for a payment of interest of $3.5 million essentially by adding that onto the deductions. And so I'm saying that addition of interest is an additional prejudice that happens over time. And so I don't know if that answers all the questions on it. Did you make this argument in the district court? This particular argument about the prejudice on the financial side? So in the record- My question is, did you make the argument you have just made in the district court? The specific argument that we're talking about with interest in financial, the financial prejudice that is suffered by Wyoming Plaza based on the addition of the interest. We made that argument in some of the briefing about the financial amount. Okay, did you make that argument on appeal? Because let me tell you, I like Judge Bachrach, you're making this argument and I don't understand it. And I don't understand that it's ever been made before. And if there's a place I could go back to understand it better in writing, I don't know where that would be. So help me with this. So Judge Murphy, I think I got confused by your initial question. And when we started discussion, discussing specifically the financial prejudice to on financial prejudice, I think the argument has shifted a little bit from what was in our brief, which was essentially the addition of that interest as a financial precedent. Right, but you concede that the district court could make a mathematical calculation and reduce that so that there was no prejudice whatsoever. You agree with that, don't you? I would agree on the financial aspect. Yes, that financial prejudice. Okay, okay. What else is there of this argument you're making on detrimental detriment to you? Is there besides what you call financial? Yes. So in our brief, we discussed specifically the delay and the prejudice from that delay in not being able to acquire witnesses who have knowledge about what happened. Oh, that's different. That's okay. Let me ask you about that. I don't understand how there's any prejudice there. I mean, from mistake to mistake. I mean, are you claiming that you could develop evidence that they intentionally paid the percentage rent and then now want to undo their intentional payments? Are you saying that you were deprived of that evidence? Uh, potentially. Potentially. So if you look at the declaration of Thomas Hanavan, it's in the record at 249 through 253. So if you take a look at the declaration of in-house counsel for Safeway, he specifically talks about what he thinks happened based on his review of the document and this paralegal that apparently made a mistake on the form. They weren't able to get a hold of or find the paralegal. So we don't have evidence on what her thought process was when the mistake was made. Now, we do believe that the parties at that point in time, given how this form was filled out, Safeway may very well have never intended to deduct. And that's why the form was filled out that way. But we don't have testimony from people. Look, it is clear that it was a financial detriment to Safeway to pay the percentage rent when they didn't have to. Now, presented with that, it seems to me you have to show that you were deprived of the opportunity to develop evidence that they had a some other motivation other than profit to pay this percentage rent when they didn't have to. And that seems strange to me. Okay. So can you help it make it more? And I understand where you're coming from and saying, you know, why would Safeway just elect not to deduct when the right was there? Well, we don't know. We know based on the record, potentially, that a mistake was made way back then. Every year from 2005 forward, Safeway sent a check. We received it. Let me just say, that means any evidence further developing information around this mistake is totally irrelevant. It was a mistake. I mean, you're not going to change those stripes, are you? Well, we have a number of witnesses that we weren't able to have any discussions with or find. And so we were left without information about that mistake. And we're stuck with their word based on a surface review by in-house counsel today of the document. No, you're not. Here's what you're stuck with. Is it they made a decision that they was not in their financial interest and they therefore call a mistake. Now, you need to show me why you were deprived of evidence to show that that was not a mistake. It was intentional. Okay. And I'm at a loss. What could you possibly have been deprived of in terms of evidence to show that this was an intentional, dumb financial decision? So we can take a look at the fifth modification. The fifth modification does not include all the terms or even a note about an amortization account. It doesn't discuss the interest rate, potentially showing an intent to ignore Section 20D of the lease. We have other documents. Okay. I'm sorry to keep interrupting you, but tie that into the answer to Judge Murphy's question. So why would the failure to note, say, 20D of the contract in the fifth modification? How did that... I still don't understand how that prejudice went in place. Well, it's not technically a prejudice per se. I'm saying if you look at the evidence and the string of events from 2002 forward, the fifth modification, which is 2002-2003, the seventh modification in 2015, the settlement agreement in 2010. I urge the court to take a look at the documents that specifically involve the settlement that the parties reached in 2010 concerning percentage rent. So when we look for references to percentage rent, what would be the point of us looking at that? In other words... Yeah, so again, back to Judge Murphy's original question, how was Wyoming Plaza prejudiced? Now you started by talking about the fifth modification in terms of witnesses. So now are we looking for witnesses about the fifth modification or the terms of the fifth modification? And if it doesn't include references to 20D, what are we to infer from that? I assume when I read your red brief, I had assumed that your point, back to the paralegal, was that Safeway is really, really, really negligent. You know, that this was just a boneheaded maneuver. And I'm guessing Mr. Kurtz probably wouldn't disagree with that. Nobody pays more money than they need to these days. So in the fifth modification, what are we looking for? I mean, you told us what we're looking for. Why are we looking for that stuff? So if you look at the pattern of documents during this relationship, while Safeway is continuing to pay rent every year, you have the fifth modification and the individuals involved with that particular document. We don't have the ability to talk to everybody who was involved on the fifth modification. The same goes with the mistake that was on the form in 2002. And then rolling forward, 2010, there actually is a witness who passed away who was involved in the settlement discussions in 2010 when Safeway and Y Plaza specifically negotiated $290,000 in overpaid percentage rent. And so then the inference that I would like the court to draw from that is you're looking at this lease on a regular basis. And you've also said that you routinely audit these leases to make sure you're paying the right amount. You find $290,000 in credits in 2010, yet you're not paying attention to Section 20D of the lease. And so I think it almost goes without saying that somebody in legal would have looked over the lease and Section 20D and did not include language specifically about the amortization account in the fifth modification in the 2010 settlement. And so through that pattern, you can see that this is Safeway essentially in 2018, going back and looking through documents, potentially realizing they had a mistake and then bringing a claim. And even beyond the discussion that we've had today on latches and the prejudice and delay, what we'd be looking at specifically is, okay, if Safeway's prime claim is money paid by mistake, in a situation not involving mutual mistake, how does that end up playing out in the face of Wyoming case law that says specifically restitutionary damages or quasi-contractual damages may not lie in a case like this where there's an existed valid contract? Do you, are you arguing that you were prejudiced because you think you would have otherwise been able to prove, had there not been the passage of time, that it wasn't really unintentional, that Safeway had intentionally been aware all of these years of this deduction and had intentionally decided to pay more money than they needed to to Wyoming Plaza? Yes. And that may seem that they would go against logic, but we do have our interrogatory responses, which are included in the submissions on summary judgment, which state essentially that we don't recall what the discussions were in 2001, 2002. And Wyoming Plaza's position would be, they may have said, we're not going to deduct under that provision at that point in time, but no one remembers, there aren't witnesses from that time period that remember. So that speaks to it. Wouldn't you think that you could at least come up with a theory of why they would do something that was against their financial interests each of these years, beginning from after the construction forward, until 2018? I need to know where this all leads. I mean, I know you can't talk to people who are dead and things like that, but what possibly could they, evidence could they put forward to make this mistake, not be a mistake, but be intentional? And I'd say without, you know, written in evidence or some sort of indication of this sort of intent, I think being good business people that have worked together for a number of years, that at some point when Y Plaza initially came on, Y Plaza was coming on as a new landlord at the time, having some arm's length discussions that, here's the lease, here's our new agreement. Okay. Hey, don't worry. We're not going to deduct into that. Obviously we don't have anything in writing of that, but maybe just good business people were starting to work together and giving each other the benefit. What you're saying is they just made multiple mistakes. They kept making mistakes. They kept being negligent. And I don't say anything else, but you know, I'm not sure where this is leading. Let me ask you this. You state alternatively that the setting side latches, and just assume we don't accept your latches theory. You're saying that Wyoming would not allow a claim like this in the face of a written contract, right? Yes, that's our argument. But you would acknowledge, wouldn't you, that the restatement takes that very position. And it doesn't matter whether there's a contract. I would acknowledge that the restatement section that we're talking about with payment being my mistake, that it could be argued specifically that potentially it could get around this particular situation. But I think it's really important to look at how the Wyoming Supreme Court has interpreted the restatement. And I think it's very clear that in Wyoming, including in the Messersmith case, that specifically there needs to be no contract for the payment made by mistake theory to apply. And I think Judge Carson brought up- So what you're saying is that Wyoming would not accept the restatement as it's articulated. Comment C, indicating contractual setting. And I'll illustration nine, having a specific lease. So you're saying that Wyoming would not accept those propositions. Yes, I am saying based on Sauerrein, Hunter, and the other cases that involve specifically bringing restitutionary claims in a case where there's a valid existing contract, the court would say no dice. The court would say specifically that we aren't going to imply some sort of term into the contract, which essentially then makes this contract not permissive anymore. The whole point of this contract is it's a permissive deduction. And so if there's a permissive deduction, there's no chance for mutual mistake. And we're not going to imply into the contract some sort of payment by mistake doctrine to make up for Safeway not permissively requesting that deduction. Okay, because we're really talking about common law in Wyoming, and common law follows policy, what possible policy reasons would there be not to allow a tenant who mistakenly pays $1,000 rent when under the contract it only owed $500? What possible policy reason would there be for Wyoming not to recognize that, which is illustration number nine? Okay, so let's talk about illustration number nine. Specifically, that is a rental agreement that specifically sets the number, and it is a shall provision. And so in that situation, both parties know, and they've both made a mistake. Here, we're dealing with a permissive language in the contract. And so the landlord didn't make a mistake. No. All right, so it's not mutual mistake. It's unilateral mistake by the tenant. Yes. All right. And so the landlord did not make a mistake. It is a may, and we want our contracts to read exactly how it was intended. So what we're looking at is, make the request to deduct under the contract, or if you don't follow the may language, you don't deduct. And so the reason that policy makes sense for not allowing this type of argument is the contract says may. If it's may, you should do it if you intend to do it. But if you don't do it for 17 years, you haven't intended to do it. So there's no mistake. And what your argument is saying, it was not a mistake. It was intentional. That's your argument, right? It's an alternative that there might not have been a mistake made, and the parties might have agreed back then that Safeway wasn't going to request the deduction. And it's a might of an alternative. It's my problem. We don't talk about mights. As our beloved Judge Baldock would say, ifs and buts were candy and nuts, every day would be Christmas. We're not talking about ifs or potentials. We're talking about what possible evidence there could be that this was intentional. And we're back to that, even under this questioning about the application of the restatement. Judge Murphy, could I interject a question along your lines? Yeah, please do. Did you have a witness, anything you presented to the district court, that there would be testimony that somebody thought that all of this was settled in 2010, and there was never going to be another question about the propriety of paying additional rent, or that any possible dispute was supposed to be sweeped into this 2010 settlement? And that gets us more over into what Judge Murphy's talking about, is some kind of evidence that this was not a mistake. Yeah, and the 2010 agreement, we just don't have any witnesses to talk to about. And I think that includes Ms. McDonald, who had since passed away. And so we had mentioned that in the brief, and I think that's in the record. If you look at the 2010 settlement agreement documents, which were included, I believe the 2010... We'll find them, don't worry. It's around 350 to 357 of the record. If you look at those, it is very clear that Safeway is agreeing, okay, we overpaid 290, we want a deduction for a few years, and then we're going to go back to paying rent moving forward. And you can see that in those particular communications in 2010, which is again, why the 2010 documents kind of fly in your face, and why I think the... I think Safeway determined after part of the briefing on summary judgment to change its claims from going back to 2005, to then going up just after that particular settlement agreement. But I think looking at those documents, it feels pretty strongly that the party's just agreed, okay, here's your deduction for a few years, and then you're going to go back to paying percentage rent. But wouldn't there be some... Oh, I'm sorry, you go ahead. Go ahead. You go and then I'll go. Yeah, I just wanted to follow up. I mean, Wyoming Plaza, if you think that there was an unwritten agreement to have resolved that any potential claim by Safeway to a deduction under Article 20D, presumably you have access to Wyoming Plaza's own personnel who could have testified, yes, we discussed with the CFO from Safeway, the Article 20D and the deductions that they were entitled to. And that was all part of the resolution of the modification agreement. But you don't have any evidence from any... I mean, you have Wyoming Plaza's personnel. You don't have any evidence to suggest that Wyoming Plaza even thought that there was some agreement for Safeway to have settled its claim under Article 20D, do you? Not specific writing as to Section 20D. A deposition, an affidavit? The depositions were taken of a couple of principals with Y Plaza. And from what I can recall, those particular depositions, they did not recall a lot of the circumstances that were involved with those particular agreements. I do believe that if you look at the documents, it looks like what happened in 2010 is the parties were just in agreement that rent would be paid, percentage rent would be paid moving forward after those deductions. But there is no specific writing or testimony that Safeway at some point agreed to not deduct under Section 20D. But doesn't that defy your very argument that each year they just... What you're trying to do is amend the contract going forward from 2010 and taking out that opportunity to pay base rent rather than percentage rent. And you're amending the contract in doing that, are you? No, I would say that because it's a May and it just hasn't been done moving forward for so many years. And I think that's one of the problems here and why we're potentially... Like you're saying that the settlement in 2010 precluded them from not paying percentage rent. That's the way I interpreted what you said. And was I wrong? I think if you go back and look at 2010 and the documents there, it's very clear that the parties agree to a different percentage rent dispute. There's a different percentage rent dispute that the Safeway Auditing Department picked up in 2010 and they brought to Y Plaza and the parties agreed, okay, paying percentage... Not answer my question. Are you saying that all those negotiations and the agreement that was made in 2010 altered the underlying lease so that this paragraph 20 didn't apply and they always had to pay a percentage rent? Is that what you're saying? It's a simple yes or no. Yes. If you go and look at the fifth modification, if you go and look at the 2010 and then 2011 estoppel certificates, it specifically states and Safeway signed it, particularly that there are no disputes under the lease. And so if you look at those particular... For those years, and does it amend the contract going forward? That's my question. And it'd be our argument that it does amend the contract moving forward and there'd be no claim moving forward. Okay, let me ask... Did you make that very argument in the district court? I believe that we did at the district court level, made the argument that that 2010 agreement was a key agreement, which essentially recognized their requirement to pay percentage rent and waived any of their claims moving forward. And you made that in your response to the summary judgment motion, correct? I believe in response and it may have been in our cross motion for summary judgment. All right. Did you also make that argument on appeal? On appeal, I believe in responding to the arguments made about the breach of contract provision. I believe that argument is in our briefing as well. All right. Judge Bacharach, he appears to be running out of time, but I was wondering if you would indulge just a couple of... Well, you certainly... And he was about to run out of time 16 minutes and 47 seconds ago. Well, I think we went over on his opposing counsel. You can ask your question. Okay. All right. So we drilled down on it, I think with Judge Murphy, but just to put the nail in it here, your position is they don't ever get to offset the build out costs even going forward. In 2023, they can't give you an amortization schedule and start offsetting costs. Yes. And I think ultimately that's the result of the district courts holding specifically on latches, which essentially would be that through the doctrine of latches, they have waived that claim. They didn't bring it soon enough. And moving forward, they won't get to do that. I got you. So that is why you believe there's no need for a deck action to determine whether there's... Whether they can do it going forward as well. Yes. Or a determination about the ones they paid under protest. Exactly. I think by the court's ruling focusing on latches, what it did is cut off any sort of future relief. It cut off the argument about payment under protest. It was essentially, you knew about this in 2001 and you didn't make a claim until 2018. So we're going to say none of that exists moving forward. Got it. Okay. Thank you. All right. We'll hear from the appellant. You have one minute for rebuttal. Thank you, Your Honor. First of all, there was a question about whether or not interest compounded. It never compounded. I mean, compound interest is where you add interest to principal and then you recalculate it. You can see that from the fact that the per diem has been $512 since the beginning. Excuse me. So that's just wrong. Secondly, they deposed Mr. Hanavan. Mr. Hanavan was the attorney who was in charge of that. We used him as our witness because he was the person who was actually in charge of that store. So that fell within his. And believe me, I'm sure I would remember and I don't remember any questioning of Mr. Hanavan about somehow safe way adopting a policy that they would not try to collect percentage rent going forward or that they ever crossed its mind. So that's just not something that ever got developed. And one of the things that council, I think, has kind of avoided is that, and we pointed it out in our briefs, they did not file a single affidavit in support of their motion for summary judgment or in opposition to ours. They did not cite to a single testimony in a deposition, nor did they cite to anything else. They did not file a single affidavit in support. So they presented no evidence, only argument with respect to the claims that were being asserted back and forth between the parties. So I probably used up my minute. Thank you very much. I really appreciate the court's courtesy to me. And I do want to thank the court for the fact that you put off the hearing as a result of my late filing of a motion to do that. I can assure the court that I was very ill and I ultimately spent eight days in a hospital, I guess, to sort of prove that. As a result of my wife finally telling me, you better go to the hospital or I'm going to divorce you. So anyway, but I'm fine now. And I came through, it was actually a bacterial infection, not COVID, but I really do appreciate how this court treated me. And quite frankly, I was really moved by the fact that two of your clerks called me the next day after it was vacated and asked how I was doing, which I thought was extraordinary. So thank you for that. Our health is... You know, I don't want to abuse the patience of the court, but can I ask a question? Sure. The disagreement that led to the estoppel certificate didn't have anything to do with what we're talking about. That's right. It had to do with the fact that the percentage rent could not exceed a certain percentage of the base rent. Isn't that correct? I believe so, Your Honor. It was different. So it had nothing to do with this exercise of the opportunity not to pay percentage rent. Right. And I believe Y Plaza during the proceedings below actually conceded that and said that that contract, that agreement had nothing to do with our claims, contrary to what counsel argued today. But of course, the record speaks for itself. And you say that was conceded in the argument on summary judgment or in the oral argument or the briefing? I just believe that there was both briefing and I don't remember it but the transcript is available. But I don't remember that ever being an issue that somehow it was barred. And certainly 2011's estoppel certificate wouldn't have anything to do with our claim for 2012. I mean, you can read the estoppel certificate and see what it says. So thank you. Thank you, counsel. Well presented. I do certainly want to appreciate your comments, Mr. Kurtz. I do want to tell you that we appreciated you bringing that to our attention. We were so sorry that you were ill. And I regret that to opposing counsel that we were traveling, all three of us that day, and we were just unable to be as accessible as we ordinarily would be. And so it was unfortunate that we weren't able to get a hold of Mr. Kurtz. Oh, and that's fine. Your clerks very much let me know that from the very beginning when I called them first thing in the morning that that may be the case. And so I had a nice trip to Denver and came back the next day. And most of the time I just slept. They have beautiful, wonderful hospitals in Denver, don't they? Well, I ended up going to the hospital in Boise. I didn't. This is a good move. That's a good move. Thank you. Thank you again so much. All right. Thank you, counsel. This court will be in recess until recall.